J-S18016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 167 WDA 2025 |

Appeal from the Order Entered January 7, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000057-2024

BEFORE:   DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED:  August 4, 2025**

L.B. (Mother) timely appeals from the order involuntarily terminating her parental rights to A.B. (Child).[1]  Child was aged two years and two months at the time of the termination hearing.  Mother argues that Allegheny County Office of Children, Youth and Families (CYF) failed to present clear and convincing evidence to support termination of her parental rights.  We affirm.

We adopt the trial court's summary of the events that led CYF to file the petition for involuntary termination of Mother's parental rights.  ***See*** Trial Ct.

---

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court's order also terminated the parental rights of M.D.-M. (Father).  Father is not a party to this appeal.

Op. at 3-12.[2]  Briefly, Mother was unhoused at the time of Child's birth in October of 2022 and delivered Child at a light rail train station in Pittsburgh, Pennsylvania  *Id.* at 3, 5.  After the birth, Mother and Child were transported to a hospital, where "Child was in need of oxygen and was placed in an incubator" and was identified as possibly having Down syndrome.  *Id.* at 3-4.  At the hospital, Mother "exhibited paranoid delusions[,] admitted to opiate use[,]" and was "unable to make medical decisions for [Child]." *Id.* at 4.  The trial court granted CYF an emergency custody protective order, a shelter care order, and medical decision-making authority for Child while he was hospitalized after birth.  *Id.* at 4-5.  Upon Child's discharge from the hospital several weeks after his birth, CYF placed Child in foster care with his adult sister, Am. B.  *Id.* at 4-5.

On February 15, 2023, the trial court adjudicated Child dependent and ordered Mother to complete specific services, including participate in supervised visitation, complete a mental health and a drug and alcohol evaluation and follow all recommendations from these evaluations, and attend parenting classes, in order to reunify with Child.  *See* Termination Petition, 6/25/24, Ex. C, (Dependency Adjudication Order, DP-679-2022, 2/15/23).  To

_____

[2] We note that the trial court's opinion contains the following typographical errors:  on page 6, the second sentence should state, "The court found by clear and convincing evidence that **Child was dependent** and that aggravating circumstances existed[]"; on page 10, the third sentence of the second full paragraph should state, "Child received occupation**al** and physical therapy"; and on page 11, Mr. Thompson's first name should be spelled "**Lesalle**." *See* Trial Ct. Op. at 6, 10-11.

support Mother toward the goal of reunification, CYF was ordered to appoint a parent support partner[3] for Mother and to make a housing referral for Mother. **See id.** The trial court also entered aggravated circumstances orders on February 15, 2023, and November 8, 2023, respectively noting that Mother's parental rights had been terminated with regard to another child of Mother and that Mother had "failed to maintain substantial and continuing contact with [] Child for a period of six months[.]" **See** Termination Petition, 6/25/24, Exs. D and E (Aggravated Circumstances Orders, DP-679-2022, 2/15/23 and 11/8/23). On January 30, 2024, CYF placed Child with A.E., Child's maternal aunt (Foster Mother), and at a permanency review hearing in March of 2024, the trial court found that Child "was doing well" and "thriving" in Foster Mother's home. **See** Trial Ct. Op. at 8-9; **see also** N.T., 1/3/25, at 69.

On June 25, 2024, CYF filed a petition to involuntarily terminate Father's and Mother's parental rights. **See** Termination Petition, 6/25/24; **see also** Trial Ct. Op. at 9. As of the date of filing and continuing through to the date of hearing on the termination petition, Child had never been in Mother's care

---

[3] Ruth Weaver, an ongoing services caseworker at CYF, testified that a parent support partner "help[s] a parent try to keep appointments. They will typically attend court with parents." N.T., 1/3/25, at 50. They may "transport[] parents . . . to appointments or [] help[] them make a plan to meet their goals in some way or another." **Id.** The trial court's opinion explains that "family support partner[s] . . . help coordinate appointments for necessary services essential for reunification between child and parent." **See** Trial Ct. Op. at 21.

and Mother had completed only three supervised visits with Child between June 9, 2023 and August 17, 2023 and had not completed any services required to reunify with Child. **See** Trial Ct. Op. at 6-12.

The trial court held a hearing on the termination petition on January 3, 2025. At this hearing, Erin Krotoszynski, Esq., of KidsVoice served as both Child's guardian *ad litem* (GAL) and legal counsel.[4] **See** N.T., 1/3/25, at 5. Attorney Krotoszynski represented that she had met with Child, who was not present at the hearing, and that he was "preverbal" and "unable to state a position" on the termination petition; and, further, opined that Child's best and legal interests align.[5] **Id.** at 106. Mother was represented by John A.

---

[4] On August 7, 2024, the trial court appointed KidsVoice to represent Child's legal interests as Child's legal counsel. **See** Trial Ct. Order, 8/7/24. The dependency adjudication order and the two aggravated circumstances orders reflect that KidsVoice served as Child's GAL at these hearings. **See** Termination Petition, 6/25/24, Exs. C, D, and E (Dependency Adjudication Order, DP-679-2022, 2/15/23, at 1; Aggravated Circumstances Orders Order, DP-679-2022, 2/5/23 and 11/8/23).

[5] In contested termination proceedings, a trial court "shall appoint counsel" to represent the child's "legal interest, *i.e.* the child's preferred outcome." 23 Pa.C.S. § 2313(a); **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020). It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." **Id.** at 1236 (citation omitted). Therefore, before appointing a GAL to also serve as a child's legal counsel, a trial court must "make [a] determination" that "counsel does not have a conflict representing the child's best and legal interests[.]" **Id.** at 1236-37; **see also In re A.C.M.**, 333 A.3d 704, 708 (Pa. Super. 2025) (vacating the decree terminating parental rights where the orphans' court delegated the responsibility to determine if a conflict existed to counsel). Here, the record does not reflect that the trial court itself made a determination that Attorney Krotoszynski "could represent [Child's] best interests and legal interests without conflict." **Compare** N.T., 1/3/25, at 5 *(Footnote Continued Next Page)*

Adams, Esq. *Id.* at 5. The trial court heard testimony from Lesalle Thompson, an outreach specialist with Pittsburgh Downtown Partnership, who worked with "the unhoused population downtown" to "connect them to any resource services that will help improve their life[]" and had attempted to connect Mother to services such as housing and mental health treatment, without success. *Id.* at 7-10.

The trial court also heard testimony from Ms. Weaver, a CYF caseworker who had worked on Child's case. *Id.* at 36-37. Ms. Weaver testified that Child has Down syndrome. *Id.* at 40. At her first meeting with Mother, Ms. Weaver reported that Mother stated "she did not want to be seeking housing [] and that the streets were her home and that's where she wanted to reside[]" and at her last meeting with Mother that Mother stated "she wanted to continue to live on the streets and [] that that was her home." *Id.* at 53-54, 87. Ms. Weaver further testified that Foster Mother "gives [Child] lots of love[,]" that Child "clearly knows who [Foster Mother] is[] and [] wants to [] be with her[,]" that Foster Mother has "done a great job of getting [Child] up

---

with *K.M.G.*, 240 A.3d at 1236. Our Supreme Court has determined, however, that there is no conflict between a child's legal and best interests "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal[.]" *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). Here, the record reflects that Child is preverbal and was age two and two months at the time of hearing; accordingly, we conclude that the *T.S.* presumption that no conflict exists between Child's legal and best interests applies and Attorney Krotoszynski was able to represent both interests. *See id.*

to date medically . . . and established with his therapies," and is a pre-adoptive resource for Child. *Id.* at 69-71.

Mother also testified at the termination hearing, appearing remotely from Allegheny County Jail where she was at that time incarcerated "awaiting disposition of criminal charges." *Id.* at 99-100; s*ee also* Trial Ct. Op. at 2-3, 22. Mother's testimony did not contradict or conflict with the testimony of Mr. Thompson nor Ms. Weaver. *See* N.T., 1/3/25, at 99-105.

On January 7, 2025, the trial court entered an order granting CYF's petition to terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b). *See* Termination Order, 1/7/25. Mother filed a timely notice of appeal and both Mother and the trial court complied with Pa.R.A.P. 1925.

On appeal, Mother raises the following issues for review:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief at 10 (renumbered).

Mother argues that she "made repeated attempts to stay involved in the case and did attend court and have several visits with [] Child[]" and "maintained contact with CYF as best as possible given her difficult

- 6 -

circumstances." ***Id.*** at 20. Mother contends that she had "limited opportunity . . . to parent [] Child since he was removed at birth." ***Id.*** at 21. Mother also complains that CYF did not provide her with mental health treatment. ***Id.*** at 21-22. Mother further claims that "Child and Mother share an important bond since they had several visits." ***Id.*** at 24.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re H.H.N.***, 296 A.3d 1258, 1263 (Pa. Super. 2023) (citations omitted); ***see also In re Q.R.D.***, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted and some formatting altered)).

> Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. §§ 2101-2938]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination

> under § 2511(a) by clear and convincing evidence, the court then
> must assess the petition under § 2511(b), which focuses on the
> child's needs and welfare.

***In re M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022) (citations omitted and some formatting altered); ***see also Q.R.D.***, 214 A.3d at 239 (explaining that if "the court determines the parent's conduct warrants termination of his or her parental rights, the court then engages in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child" (citation omitted and formatting altered)). We need only conclude that the petitioner established grounds for termination as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm a decree terminating parental rights. ***See In re K.T.***, 296 A.3d 1085, 1105 (Pa. 2023).

Following our review of the record, the parties' briefs, the relevant law, and the trial court's well-reasoned analysis, we affirm on the basis of the trial court's opinion. Specifically, we agree with the trial court's conclusion that CYF presented clear and convincing evidence that termination was warranted under Section 2511(a)(1) and was in Child's best interest pursuant to Section 2511(b). ***See*** Trial Ct. Op. at 17, 26-31. Further, the trial court thoroughly explained its reasons for terminating Mother's parental rights under Section 2511(a)(1) and its conclusion that termination was in Child's best interests pursuant to Section 2511(b). ***See id.*** For these reasons, we conclude that the trial court did not abuse its discretion or err in granting CYF's petition to

terminate Mother's parental rights.  ***See H.H.N.***, 296 A.3d at 1263; ***see K.T.***, 296 A.3d at 1105.  Accordingly, we affirm.[6]

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  8/4/2025

---

[6] The parties are directed to attach a copy of the trial court's opinion in the event of further proceedings.  We note that the trial court's opinion contains the following citation errors:  on page 13, the citation to ***Kimock v. Jones*** should pinpoint cite to 855; on page 15, the citation to ***In re S.D.T., Jr.*** should pinpoint cite to **706**, the quotation from ***In re K.T.*** should note the omission of a footnote, and the pinpoint cite for ***In re S.H.*** should be to **805**; on page 27, the citation to ***In re E.M.*** should pinpoint cite to 484; and on page 31, the citation to ***In re B.L.W.*** should be 843 A.2d **380**.

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| A.B.,<br>     MINOR CHILD, | : | CP-02-AP-0000057-2024 |
| APPEAL OF: | : | |
| | : | 167 WDA 2025 |
| L.B.,<br>     Mother. | : | **OPINION OF THE COURT** |

Spurgeon, J.                                                                 3/3/2025

<u>OPINION</u>

On January 7, 2025, following a hearing related to a Petition for
Involuntary Termination of Parental Rights ("TPR") filed by the Allegheny
County Office of Children, Youth and Families ("CYF"), this court issued an
order that granted the petition to terminate the parental rights of L.B.
("Mother"), and father, M.D.-M. ("Father") to A.B. ("Child"). The court found
that grounds existed to terminate Mother's parental rights pursuant to 23
Pa. C.S. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8) and §2511(b) as to the
minor child. Mother appeared at the TPR hearing remotely from the

Allegheny County Jail. Mother and Father were competently represented by their respective counsel at the TPR hearing.[1]

On January 29, 2025, Mother, through counsel, filed a Notice of Appeal. First, Mother asserts that the court erred when it concluded that clear and convincing evidence existed to terminate her parental rights under 23 Pa. C.S. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8). Second, Mother asserts the court erred when it ruled, pursuant to 23 Pa. C.S.§2511(b), termination of her parental rights would best serve the needs and welfare of Child. Because Father did not appeal the court's order that terminated his parental rights, the court will only address Mother's matters complained of on appeal. For the reasons set forth below, the order terminating the parental rights be affirmed.

## RELEVANT FACTS

Child was born October 28, 2022, at the Downtown Pittsburgh "T" light rail train station. Mother and Child were transported to West Penn

---

[1] Father's parental rights were terminated pursuant to 23 Pa. C.S. §§2511 (a)(2), (a)(5), and (a)(8) and §2511(b). Father does not appeal the Order of Involuntary Termination of Parental Rights dated January 7, 2025.

Hospital in Pittsburgh, PA.[2] An emergency custody agreement was obtained by CYF on the same date.[3]

At the time of Child's birth, it was suspected that he had Down syndrome. Child was in need of oxygen and was placed in an incubator while at the hospital.[4] The medical staff determined that Child required additional tests; however, Mother was unable to make medical decisions for him.[5]  While at the hospital, Mother exhibited paranoid delusions that caused staff concerns. Mother also admitted to opiate use. Mother irrationally expressed to hospital staff that she wanted to start a fire in the hospital room in order to keep Child warm, that she wanted to take Child out of the incubator, that she observed a hole in Child's head, and she ranted about government conspiracies.[6] While at the hospital, Mother identified Father as "M.D.-M." to CYF and provided the agency with a phone number, though CYF was unable to reach Father.[7]

On November 2, 2022, pursuant to a Shelter Care Order, the court found that to allow the Child to remain in the home of Mother would be

[2] Trial Transcript (Hereinafter referred to as "T.T.")  at 41
[3] Id.
[4] Id.
[5] Id.
[6] T.T. at 42
[77] Id.

contrary to the Child's welfare and the reasonable efforts were made by CYF to prevent or eliminate his removal.[8]

On November 7, 2022, the court appointed CYF as medical decision maker.[9] Child remained in the hospital until his discharge date of November 16, 2022.[10] CYF completed a Care Coordination for Child. Child was immediately placed in foster care, through A Second Chance Kinship Home, at his adult sister Am███ B.'s and M███ S.'s home.[11] On December 7, 2022, Mother was appointed a Guardian Ad Litem.[12]

During this time period, Mother was unable to be located. Mother was unhoused and was last known to CYF to frequent Downtown Pittsburgh. Mother was known to CYF to have a history of mental health, specifically schizophrenia, and substance abuse issues. Mother's history with CYF dated back to 1999. Mother had ten children, all of whom were out of her care. Three children aged out and are now adults. Four children were in the custody of their fathers, and two children were terminated from Mother's care pursuant to TPRs in 2017 and 2019.[13]

---

[8] CYF Combined Exhibit 1 (Shelter Care Order)
[9] CYF Combined Exhibit 1 (Order of Appointment-Medical Decision Maker: 11/07/2022)
[10] T.T. at 44
[11] Id.
[12] CYF Combined Exhibit 1 (Order of Appointment-Guardian Ad Litem for Parent)
[13] T.T. at 40; 49

Child was adjudicated dependent on February 15, 2023.[14] The court found by clear and convincing evidence that the Child be dependent and that aggravating circumstances existed.[15] KidsVoice was appointed as educational decision maker.[16] Mother was ordered to complete a drug and alcohol assessment through POWER and follow all recommendations, mental health assessment, attend parenting classes through Arsenal, be appointed a Parent Support Partner, have supervised visitation, acquire housing through CYF, and maintain contact with CYF.[17]

The court conducted a Permanency Review Hearing on June 5, 2023. The court found that Mother made no progress with the permanency plan, as she had not complied with the court ordered mental health assessment and/or treatment, obtained housing, nor had any visitation with Child since his initial hospitalization at the time of his birth.[18]

A second Permanency Review Hearing was held on August 28, 2023. The court found that Mother made no compliance with the permanency plan. Mother made no progress towards alleviating the circumstances which necessitated the original placement. The court further found that the

[14] T.T. at 44
[15] CYF Combined Exhibit 1 (Aggravated Circumstances Order: 02/15/2023)
[16] CYF Combined Exhibit 1 (Order of Appointment-Educational Decision Maker)
[17] CYF Combined Exhibit 1 (Order of Adjudication and Disposition: 02/15/2023)
[18] CYF Combined Exhibit 1 (Permanency Review Order: 06/05/2023)

6

Child had serious medical needs that were being met by his foster parent. Child had cardiology and ophthalmology appointments. Child was also working with the Down Syndrome Clinic.

The court found Mother continued to remain unhoused. Mother did not follow through with POWER assessment nor did she complete a mental health evaluation. The court found that Mother only began visits on June 9, 2023 and stopped the visits. Mother began visits again on August 17, 2023, but it was terminated after Mother tried to give Child a bottle of water with large chunks of fruit after being told multiple times to stop. In addition, Mother continued to speak of governmental conspiracies, celebrities and CYF during the visit.[19]

The court ordered Mother to follow through with a mental health evaluation and treatment, to attend Arsenal Parenting Classes, to meet with her Parent Support Partner, and to have supervised visits and confirm with CYF in advance with early arrival.[20]

A third Permanency Review Hearing was held on October 23, 2023. The court found that Mother made no compliance since the last hearing.

---

[19] CYF Combined Exhibit 1 (Permanency Review Order: 08/28/2023)
[20] Id.

Child was moved from the home of Am███ B. and placed with his maternal grandparents, G███ B. and B███ B.

The court found that Mother was not communicative with CYF. Mother remained unhoused. Mother had been found to have locked herself in public restrooms in the downtown section of the City of Pittsburgh. Mother had no visits since August 17, 2023.[21]

A second aggravated circumstances hearing was held on November 8, 2023. A second appointment of medical decision-maker was granted to G███ B. and B███a B.[22] Am███ B. was made a secondary medical decision-maker.[23] Ultimately, the Child's maternal aunt, A███ E. was appointed as his educational and medical decision-maker on February 28, 2024.[24]

A fourth Permanency Review Hearing was held on March 4, 2024. The court found that Mother made no compliance towards the permanency plan. Further, the court found Mother had made no progress towards alleviating the circumstances which necessitated the Child's placement.

---

[21] CYF Combined Exhibit 1 (Permanency Review Order: 10/23/2023)
[22] CYF Combined Exhibit 1 (Order of Appointment- Medical Decision Maker: 11/08/2023)
[23] CYF Combined Exhibit 1 (Order of Appointment-Secondary Medical Decision Maker: 11/08/2023)
[24] CYF Combined Exhibit 1 (Order of Appointment- Educational and Medical Decision Maker: 02/28/2024)

The court found that Mother had no visits with Child during this review period. Mother had been provided with transportation for said visits. Mother was still unhoused and did not complete her mental health and drug and alcohol assessments as previously ordered.[25]

The court found Child was doing well in the home of his maternal aunt, A███████ E. Child was adjusting, had a regular sleep schedule, and was thriving in the home. Maternal aunt was willing to coordinate with service providers and desired to continue to work with care coordinators.[26] The Termination of Parental Rights petition was filed on June 25, 2024.

A fifth Permanency Review Hearing was held on July 29, 2024. The court found that Mother made no compliance with the permanency plan and that no progress had been made towards alleviating the circumstances which necessitated the original placement.[27]

The court found that Mother did not have any contact with CYF during this reporting period. Mother had negative interactions with the City of Pittsburgh Police and had pending criminal charges. Mother was still unhoused, but was working with the Downtown Street Team, an organization equipped to engage the homeless population in the City of

---

[25] CYF Combined Exhibit 1 (Permanency Review Order: 03/04/2024)
[26] Id.
[27] CYF Combined Exhibit 1 (Permanency Review Order: 07/29/2024)

Pittsburgh. Mother had only one visit during the reporting period, which she left early.[28]

Mother testified at the PRH and presented in an incoherent and rambling manner. Mother identified the maternal aunt, A█████ E. as her child. Mother made other incoherent remarks about her child from "Lyndell's stem cell".[29]

The court found that Child was doing well in the home of his maternal aunt. Child was enrolled in daycare. Child was up to date medically and had scheduled urology and dental examinations. Child received occupation and physical therapy and regular appointments with the Down Syndrome Clinic.[30]

The court ordered Child to remain in the home of his maternal aunt, was allotted funds for clothes, and ordered Child to receive all medical care and necessary services and therapies. The court further ordered Mother to follow through with in person forensic psychological evaluations, mental health and drug and alcohol recommendations, and to attend Arsenal Parenting classes.[31]

---

[28] Id.
[29] Id.
[30] Id.
[31] Id.

A sixth and final Permanency Review Hearing was held on November 18, 2024. The court found that Mother made no compliance with the permanency plan and that no progress had been made towards alleviating the circumstances which necessitated the original placement.[32]

The court found that Mother remained unhoused, had not been in contact with CYF and had not visited Child for six months. Mother did not attend the interactional forensic psychological evaluation with Dr. Patricia Pepe.[33]

The court ordered Child to remain in the maternal aunt's home. Child had been in placement for 15 of the past 22 months. The court scheduled a Goal Change for January 3, 2025.

Pursuant to CYF's petition, a Termination of Parental Rights hearing was conducted on January 3, 2025.

At the TPR hearing, the following witnesses testified:

1. Lasalle Thompson – Street Outreach Specialist, Pittsburgh Downtown Partnership;
2. Kirk Thoma – Visitation Specialist Coach, Children's Institute;
3. Ruth Weaver – Caseworker, Allegheny County CYF;
4. L.B. – Mother.

---

[32] CYF Combined Exhibit 1 (Permanency Review Order: 11/18/2024)
[33] Id.

11

The following exhibits were admitted into evidence:

CYF #1 – Court Orders (Combined);

CYF #2 – Family Plans;

CYF #3 – Mother's Criminal Record;

CYF #4 – Father's Criminal Record;

CYF #5 – Dr. Patricia Pepe's Evaluation;

CYF #6 – Father's PFA;

CYF #7 – Mother's PFA.

At the time of the TPR hearing, Child had been in CYF care since his birth on October 28, 2022. The Child has never been in Mother's care. Mother has never complied nor made progress with any of the stated goals.

## STANDARD

The Standard for review in termination cases is well established.

The standard of review in termination of parental rights cases requires appellate courts to "accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id*. The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id*. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)

12

In a termination of parental rights proceeding, the best interest of the child is not the initial or only consideration, as the court must find that the statutory grounds for termination of parental rights have been met. *Kimock v. Jones*, 47 A.3d 850 (Pa. Super. 2012).

CYF based its petition to terminate putative Mother's parental rights pursuant to 23 Pa. C.S.A. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8). These subsections provide for the involuntary termination of parental rights if the petitioner can establish any of the following grounds.

> (a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (a)(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot be remedied by the parent.
>
> (a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

13

(a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8).

Once the statutory grounds for involuntary termination of parental rights have been demonstrated by clear and convincing evidence, the court must consider whether the termination would meet the needs and welfare of the child under §2511 (b):

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the development, physical and emotional needs, and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa.C.S.A. §2511(b).

A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; if it is determined that this burden of proof has been met, then the trial court must next consider the second step of the process, which entails a determination of whether termination best

14

serves the needs and welfare if the child. *In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007). When determining whether termination of parental rights serves the child's needs and welfare, the court must examine the nature and status of any bond between the parent and the child and consider whether severing that bond would destroy a relationship that is "necessary and beneficial." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990). Finally, the court must "conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude severance based solely on evidence of an "adverse" or "detrimental" impact to the child. Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *In re K.T.*, 296 A.3d 1085, 1114 (Pa. 2023).

When reviewing an order terminating parental rights, the appellate court "is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re S.H.*, 879 A.2d 802, 809 (Pa. Super. 2005). Furthermore, the trial court is "the sole determiner of the credibility of witnesses and resolves all conflicts in testimony." *Id*.

## DISCUSSION

Mother appealed the order terminating her parental rights to the Child and alleged:

The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1)…

The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(2)…

The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(5)…

The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(8)…

The trial court abused its discretion and/or committed an error of law in finding CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Child pursuant to 23 Pa. C.S.A. §2511(b)…

16

[See: Mother's Concise Statement of Matters Complained of on Appeal filed on January 29, 2025]

With respect to the first issue Mother raises under 23 Pa.C.S.A. §2511(a)(1), the record clearly demonstrates that Mother had no contact for a period of six months prior to the filing of the TPR petition. The court received credible testimony from Ruth Weaver, a caseworker form CYF who had been assigned to the case since starting at the agency as an intern, who testified that Mother's last visit was on August 17, 2023.[34] At the last two prior visits, Mother appeared, said "hi" to the Child and abruptly left the visit.[35] The previous visit, Mother appeared for the visit with a pair of pants on her head.[36] More concerning though was that Caseworker Weaver had to stop the last visit of August 17th because Mother continued to feed Child water that contained large chunks of fruit. Considering the Child's age and condition, Mother had to be told that it was inappropriate and Mother refused to be redirected.[37]

With respect to 23 Pa. C.S.A. §2511(a)(2), the court heard testimony that Mother had "a long history with the agency that dated back to 1999".[38]

---

[34] T.T. at 58
[35] Id.
[36] Id.
[37] T.T. at 59
[38] T.T. at 40

Mother had a total of ten children, none of whom ever remained in her care. CYF had more recent interactions in 2017 and 2019 as Mother had her parental rights terminated to two children. The agency was aware of Mother's psychiatric diagnosis of schizophrenia as well as her opiate use disorder, alcohol consumption and her chronic housing issues.[39]

Six years later, Mother is in the same position she was in 2019. Mother was unhoused and not engaged in any services to address her mental health issues. Mother has not engaged in any drug and alcohol treatment. During the pendency of this proceeding, Mother had continued negative contact with law enforcement and had new pending criminal charges. Further, Mother has not demonstrated any capacity to exercise good judgement for herself, notwithstanding Child. Mother did not present any credible evidence to the contrary. Therefore, it is the opinion of the court that CYF has met their burden under this prong.

With respect to 23 Pa.C.S.A. §2511(a)(5) and (8), it is indisputable that the Child has been in care the requisite period of time, six and twelve months, respectively.

Next, the court references the record developed throughout the onset of the case as it relates to Mother's inability to remedy the issues that led to

---

[39] Id.

Child's removal. Specifically, Mother had a history of mental health and substance abuse issues. Additionally, Mother was chronically unhoused and made no efforts to remedy that issue.

This court made a finding of aggravated circumstances based on Mother's failure to maintain substantial and continuing contact with child for a period of six months and failure to comply with the identified family service plan goals to remedy the conditions that led to the removal of the Child.[40] Family service plan goals included a mental health assessment, drug and alcohol assessment through POWER, attend parenting classes through Arsenal, be appointed a Parent Support Partner, have supervised visitation with Child, acquire housing through CYF, and maintain contact with CYF.[41]

CYF had difficulties reaching Mother despite Mother having a GAL and the support of the Downtown Pittsburgh Street team.[42] Mother remained unhoused the entire period of time this matter was before the court. Mother did not have a working cell phone which created an impediment in CYF locating Mother. Caseworker Weaver testified that the agency would go to the extreme to contact the security team at the Health

---

[40] CYF Combined Exhibit 1 (Aggravated Circumstances Order: 11/08/2025); T.T. at 45
[41] CYF Exhibit 2 (Family Plans)
[42] T.T. at 47

and Human Services Building, a locale she would frequent, to make contact with her.[43] The court therefore found Mother did not comply with this goal.

Mother was ordered to undergo a mental health assessment and to comply with recommended treatment. Mother failed to comply with this goal. CYF, who was aware of Mother's mental health history, offered to assist her in meeting her mental health goal.

CYF Caseworker Weaver testified that the agency referred Mother to Dr. Patricia Pepe, Ph.D. for an individual psychological assessment and for interactional evaluations with Child.[44] Caseworker Weaver testified Mother failed to show on five occasions for Dr. Pepe.[45] The court found Mother failed to comply with this goal.

Mother was ordered to undergo a drug and alcohol assessment and comply with treatment. Mother failed to comply with this goal. Mother has an extensive history with drugs and alcohol. Mother was referred to POWER for assessments on November 14, 2022 and again on June 20, 2023. Mother failed to complete either assessment.[46] The court therefore found that Mother did not comply with this goal.

---

[43] Id.
[44] T.T. at 49; T.T. at 50
[45] T.T. at 50
[46] Id.

Mother was given a family support partner to help coordinate appointments for necessary services essential for reunification between child and parent.[47] Family support partners are especially important in matters such as this one, as they are able to provide transportation to those necessary appointments.

Mother was ordered to cooperate with CYF parent-support partners. Mother failed to comply with this goal. Caseworker Weaver testified that on July 20, 2023, Mother, her parent-support partner, and she met in the downtown area.[48] Mother was very upset and did not want to speak with her or the support partner.[49] Mother was provided written instructions by Caseworker Weaver for her supervised visits and how to address missing future visits. Mother refused to take the instructions.[50] Instead, Mother ranted about governmental conspiracies which caused the meeting to be unproductive.[51] Shortly thereafter, the family support partner contacted CYF to inform that they decided to close interest in the matter due to insufficient contact with Mother.[52] The court therefore found that Mother failed this goal.

---

[47] Id.
[48] T.T. at 51
[49] Id.
[50] Id.
[51] Id.
[52] Id.

21

Mother was ordered to comply with other family service providers. Mother had access to the Downtown Street Team street-psychologist who is able to coordinate mental health treatments, medications and temporary housing for the unhoused population.[53] CYF was never able to confirm if Mother ever connected with this service provider. CYF Caseworker Weaver testified that Mother told her that she did not want their services and also told her "the streets were her home and that's where she wanted to reside."[54] Mother failed to comply with this goal.

At the time of the TPR hearing, Mother was in the Allegheny County Jail awaiting disposition of pending criminal charges. [55] Unfortunately, CYF was unable to confirm whether Mother had sought any mental health treatment or drug and alcohol assessments or treatment while incarcerated.[56] Further, Mother had provided CYF with no real plan of action regarding housing following a release from custody.[57]

Mother was ordered parenting classes as a goal and was referred to Arsenal parenting classes on November 18, 2022. Mother failed to show for

---

[53] Id.
[54] T.T. at 54
[55] CYF Exhibit 3 (Mother's Criminal Record)
[56] T.T. at 54; T.T. at 55
[57] Id.

the intake. Mother began her first parenting class approximately eight months later on June 29, 2023.[58]

Mother was ordered to do coached visits that were supervised through A Second Chance and Caseworker Weaver.[59] The Caseworker testified that Mother appeared excited to see Child. She also testified that Mother needed prompting to hold Child, due to his conditions brought about by Down syndrome.[60] Caseworker Weaver testified that she had to redirect Mother as she was ranting about the "government putting children in the military" and would become angered at times during the visit.[61] She also asked the caseworker to "not tell her father that she (Mother) was buying drugs."[62] CYF Caseworker also had concerns about Mother's appearance for the visit. Mother was dressed for the visit wearing a pair of pants on her head.[63]

Mother had attended two other visits, and one where she showed up, said "hi" and left the visit. The last true visit with Child was on August 17, 2023, where she fed the Child chunk-fruit water. CYF explained the rationale to terminate the previous visits early as well as feeding the Child

---

[58] T.T. at 56
[59] T.T. at 57
[60] Id.
[61] Id.
[62] Id.
[63] T.T. at 58

only formula as fruit was a choking hazard. Mother failed to accept the parental redirection, became very upset when she was told that the visit would be canceled if that were to occur again.[64] Based on the behaviors exhibited in the coached visitation setting, and unwillingness to accept parental re-direction, CYF had legitimate concerns for Mother being able to understand the Child's needs given his medical issues and would require too much redirection under these circumstances.[65]

The court found Mother provided no evidence and no credible testimony to demonstrate that she addressed any of the goals to remedy the issues that lead to the Child's removal, which was overwhelmingly supported by the record. Further, Mother failed to recognize or acknowledge her duties as a parent to this Child as evident in the record through her interactions with CYF. The court therefore found that Mother failed to meet any of the goals articulated by the court.

Next, the statute requires the court to consider whether or not termination would best serve the Child's needs and welfare. The court accepted testimony from CYF Caseworker who observed the Child in four different homes since his birth, including a respite home, his adult sister,

---

[64] T.T. at 53
[65] T.T. at 59

Am███ B., his maternal grandparents, who despite their love, were unable to care for Child due to their ongoing medical conditions and the Child's needs, and his current placement with A████ E.[66]

Mother has never provided parental duties to Child. She was not involved in the day-to-day care of the Child. Mother was never permitted unsupervised visitation and failed to recognize the special needs necessary to care for him. She was not involved in his medical treatment or any therapies he required. She neglected all those responsibilities and was no longer the medical or educational decision-maker for Child.

Caseworker Weaver testified that she had first-hand observations of interactions between A████ E. and Child that displayed lots of love and affection.[67] A████ E. would get down on the floor and play with the Child.[68] She would cuddle with him. Most importantly, she brought him up to date medically.[69] She has also coordinated his therapies.[70]

A████ E. has demonstrated a clear desire to adopt Child. She is protective of Child. She was observed by Dr. Pepe during the interactional visit to offer Child affection to which Child responded.[71]

---

[66] T.T. 70
[67] Id.
[68] Id.
[69] Id.
[70] T.T. at 71
[71] CYF Exhibit 5 (Dr. Patricia Pepe, Ph.D. Evaluation)

Child has significant medical and therapeutic hurdles and that his biological Mother is not ready, willing or capable of parenting. It is the court's opinion that CYF has provided compelling evidence that termination would best serve Child's needs and welfare. The Child has been without his Mother since his birth. Mother has done nothing to remedy the issues that led the Child to be placed in agency care. Mother's history with the agency is lengthy and unfortunately, unchanged. Therefore, the order terminating Mother's rights under 23 Pa.C.S.A. §2511(a)(5) and (8) should be affirmed.

The second prong of the analysis concerns whether CYF has proven that termination is in the child's best interest pursuant to 2511(b). In relevant part, 23 Pa.C.S.A. §2511(b) requires the court to give "primary consideration to the developmental, physical and emotional needs and welfare of the child" when terminating the rights of a parent.

As discussed by the Superior Court [in] *In re N.A.M.*, the inquiry into whether terminating a parent's rights serves the best interest of the child's needs and welfare necessitates an inquiry into the nature and status of any bond between the parent and child and the effect of severing that bond if it exists:

26

However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008)

While a parent's emotional bond with his or her child is a major aspect of subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the Court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008) The mere existence of an emotional bond does not preclude the termination of parental rights. See *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination 'would destroy an existing, necessary and beneficial relationship.'

 *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003)

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); see also *In re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2008) (discussing proper analysis of parent-child bond in terminating parental rights)

*In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993) and its progeny have shaped the traditional subsection (b) analysis and calls for interpretation of any child bond.  With respect to this determination, as set forth above, this court conducted a parent-child bond analysis. In so doing, the court is not required to use expert testimony and may rely upon the evaluations of social workers and caseworkers as well. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). The effect of the bond-effect analysis necessarily

27

depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

More recently, our Supreme Court held that the court must "conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude severance based solely on evidence of an "adverse" or "detrimental" impact to the child. Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial". *In re K.T.*, 296 A.3d 1085, 1114 (Pa. 2023).

In making its decision to terminate Mother's parental rights, the court heavily relied on the record as a whole. In the instant matter, the court had no evidence of any bond between Mother and Child due to Child being out of Mother's care since his birth; Mother's lack of any contact with Child during her absence; and Mother's refusal to engage with any of the services required for family reunification.

The court also weighed the foster parent's ability to care for the Child and their interactions. The court also examined the extent of the Child's needs in the context of his medical and therapeutic needs.

The court received the interactional evaluation of Dr. Pepe, an expert, and was accepted by this court as CYF Exhibit 5. Contained therein was a

detailed analysis of A█████ E. and Child's relationship, contained the expert's opinion as in regards to bonding and the lack thereof.

In this matter, Mother failed to present for her forensic and interactional evaluations with Dr. Pepe on five separate occasions. Additionally, Mother did not comply with her court ordered goals. Therefore, Dr. Pepe opined within a degree of psychologial certainty that Mother was in no position to provide a home for her son.[72]

In contrast, Dr. Pepe had an opportunity to observe the bond between Child and his maternal aunt.[73] Dr. Pepe observed the Child to be clearly comfortable in his aunt's presence.[74] Child was willing to explore.[75] Child maintained close physical contact with his aunt.[76] Likewise, Child's aunt was consistently responsive to Child.[77] Child views aunt as his psychological parent, as she provides his daily care and needs.

Considering the record developed on this issue, Mother failed to present any credible evidence to demonstrate a bond with Child. Mother has not assumed any parental role to demonstrate that she can or is willing to meet the needs and welfare of Child. Mother has only seen the Child on

---

[72] CYF Exhibit 5 (Dr. Patricia Pepe, Ph.D. Evaluation)
[73] Id.
[74] Id.
[75] Id.
[76] Id.
[77] Id.

approximately three (3) occasions, and at all times supervised. This toddler also has Down syndrome that necessitates more intensive parenting that Mother is not capable to provide.

In contrast, the court finds that a strong and positive bond does exist between Child and his maternal aunt, A███████ E., with whom Child has lived with for nearly two years. The court further finds that the relationship between the foster parent and the Child is loving, stable and provides Child security. Mother has relinquished or abandoned all parental responsibility, leaving CYF and/or foster parent to care for Child. Mother has had no engagement into the day-to-day care of Child, medical appointments or therapies related to his Down syndrome diagnosis.

Child in this instance deserves permanency and has been in care for approximately 27 months at the time of the TPR hearing. Mother has never had Child in her care. Courts must keep in mind the ticking clock of childhood. "Children are young for a scant number of years and we have an obligation to see their health development quickly." *In re* R.W., 2018 WL 3423812 (Pa. Super. 2018). Having conducted an individual analysis on this case, with a focus on Child, the court finds that the relationship between the foster parent and the Child meets his needs and welfare, and that terminating Mother's parental rights is in the Child's best interests.

The Commonwealth has an interest not only in family reunification, but also to the Child's right to a stable, safe and healthy environment. *In re B.L.W.*, 843 A.2d 830 (Pa. Super. 2004), appeal denied, 963 A.2d 1141 (Pa. 2004).

Therefore, the evidence established that termination will be able to provide Child with much needed stability and permanence at his age and this court concludes that the developmental, physical, and emotional needs and welfare of the Child would be best served by terminating Mother's parental rights under 2511(b).

## CONCLUSION

The evidence discussed above amply supported the court's conclusion that the Child's non-existent bond with Mother "no longer helps but rather hinder[s] the child".[78] It is clear that a relationship between Mother and the Child is not beneficial. The foster home provides security for the Child and he is strongly bonded to his foster family. CYF has carried the burden of proving by clear and convincing evidence that Mother's rights should be terminated, that no meaningful, beneficial, or necessary bond between Mother and Child exists, and that the Child's best interest would

---

[78]*In re P.A.B.*, 570 A.2d 522, 526 (Pa. Super. 1990)

be served by permitting the Child's adoption. Therefore, for these reasons, the court's order should be affirmed.

BY THE COURT:

_____, J.

The Hon. David L. Spurgeon